UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 31, 2018

GLORIA DE LA PAZ on behalf of a
minor S.S.D.,

                          Plaintiff,

              -v.-

COMMISSIONER OF SOCIAL
SECURITY,

                          Defendant.

17 Civ. 4804 (KPF) (BCM)

OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION

KATHERINE POLK FAILLA, District Judge:

Pending before the Court is the August 6, 2018 Report and

Recommendation from United States Magistrate Judge Barbara Moses (the

"Report") recommending that Plaintiff Gloria De La Paz's petition on behalf of

her minor son, S.S.D., for Supplemental Security Income ("SSI") be denied.  For

the reasons set forth below, the Court finds no error in the Report and adopts

it in its entirety.

## BACKGROUND

This summary draws its facts from the detailed recitation in the Report,

to which neither party objects.  (*See* Report 1-16).  On November 18, 2014,

Plaintiff filed an application for SSI on behalf of her minor son, S.S.D., alleging

disability since September 23, 2014 due to a learning disability and asthma.

(Report 1-2).  Plaintiff's application was denied on January 16, 2015.  (*Id.* at 1).

She requested and was granted a hearing on December 8, 2015, at which both

she and S.S.D. (who was almost ten years old and in the fifth grade) testified,

without counsel, before Administrative Law Judge ("ALJ") Mark Hecht.  (*Id.* at

1, 10).  On January 13, 2016, ALJ Hecht issued a written opinion determining that S.S.D. was not disabled within the meaning of the Social Security Act as defined in 42 U.S.C. § 1382c(a).  (*Id.* at 1, 11-16).  On April 25, 2017, the Appeals Council denied Plaintiff's request for review.  (*Id.* at 2).

Plaintiff filed this action on June 23, 2017, seeking judicial review of the Commissioner of Social Security's (the "Commissioner's") determination. (Report 2).  The Commissioner moved for judgment on the pleadings on January 9, 2018.  (*Id.*).  Following Plaintiff's failure to file any opposition or cross-motions, the Court *sua sponte* extended Plaintiff's deadline to respond to April 30, 2018.  (*Id.*).  Plaintiff again failed to file any opposition or cross-motions.  (*Id.*).  Judge Moses's report and recommendation was issued and also mailed to Plaintiff on August 6, 2018.  (Dkt. #26).  Objections were due on August 20, 2018.  (Dkt. #26).  Neither party has objected to the report and recommendation.

Judge Moses recommended that this Court grant the Commissioner's motion and dismiss the case.  (Report 29).  Judge Moses found, first, that ALJ Hecht had satisfied his duty to develop a record, even though he did not obtain a medical source statement from S.S.D.'s treating physician, Dr. Vanessa Bobb, because the record contained sufficient other evidence from which to assess S.S.D.'s condition.  (Report 6, 18-21).  Next, Judge Moses determined that substantial evidence in the record supported ALJ Hecht's decision that S.S.D.'s impairments neither met nor medically equaled the criteria for

disability as defined by 42 U.S.C. § 1382c(a).  (Report 21-29).

## DISCUSSION

In reviewing a Magistrate Judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C). Where, as here, no timely objections have been filed, "a district court need only satisfy itself that there is no clear error on the face of the record."  *King* v. *Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (internal quotation marks and citation omitted), *aff'd*, 453 F. App'x 88 (2d Cir. 2011) (summary order).  "A party's failure to object to a report and recommendation, after receiving clear notice of the consequences of such a failure, operates as a waiver of the party's right both to object to the report and recommendation and to obtain appellate review."  *Grady* v. *Conway*, No. 11 Civ. 7277 (KPF) (FM), 2015 WL 5008463, at *3 (S.D.N.Y. Aug. 24, 2015) (citing *Frank* v. *Johnson*, 968 F.2d 298, 300 (2d Cir. 1992)).

Because Plaintiff has not filed an objection, nor even filed a motion or submission in opposition to the Commissioner's motion for judgment on the pleadings, she has waived her right to object and to obtain appellate review. Even so, the Court has reviewed the Report and finds that its reasoning is sound and it is grounded in fact and law.  Accordingly, the Court finds no clear error and adopts the Report in its entirety.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Moses's

Report in full. Accordingly, it is hereby ordered that the Commissioner's motion for judgment on the pleadings is GRANTED, and the case is DISMISSED.

The Clerk of Court is directed to terminate the motion at docket entry 23.

SO ORDERED.

Dated: August 31, 2018
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*

Gloria De La Paz
1738 Lexington Avenue, Apt. 6B
New York, NY 10029

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/6/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLORIA DE LA PAZ, o/b/o S.S.D.,

        Plaintiff,

-against-

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

17-cv-4804 (KPF) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. KATHERINE P. FAILLA**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Gloria De La Paz filed this action *pro se* on behalf of her minor son, S.S.D., pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), challenging a decision by the Commissioner of Social Security (Commissioner) denying S.S.D.'s application for Supplemental Security Income (SSI). Now before the Court is the Commissioner's unopposed motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, I respectfully recommend that the motion be GRANTED.

## I.   BACKGROUND

### A.   Procedural Background

Plaintiff filed S.S.D.'s application for SSI on November 18, 2014, alleging disability since September 23, 2014. *See* Social Security Administration (SSA) Administrative Record (Dkt. No. 16), at 99 (hereinafter "R. __."). On January 16, 2015, the SSA denied the application. (R. 63.) On March 24, 2015, plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 69.) On December 8, 2015, plaintiff and S.S.D. appeared and testified, without counsel, at a hearing before ALJ Mark Hecht. (R. 36-51.) No other witnesses appeared at the hearing. (*Id.*) In a written opinion dated January 13, 2016, the ALJ determined that S.S.D. was not disabled within the meaning of the Act. (R. 6-35.) On February 24, 2016, plaintiff requested

review of the ALJ's decision. (R. 4-5.) The Appeals Council denied plaintiff's request for review on April 25, 2017, making the ALJ's decision final. (R. 1-3.)

On June 23, 2017, plaintiff filed this action seeking judicial review of the Commissioner's decision. Compl. (Dkt. No. 1). On January 9, 2018, the Commissioner moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings. (Dkt. No. 23.) Plaintiff did not file any opposition or cross-motion. By Order dated April 4, 2018, the Court, *sua sponte*, extended plaintiff's time to respond to the Commissioner's motion until April 30, 2018. (Dkt. No. 25.) Plaintiff did not respond, and the Court now deems this matter fully submitted.

### B. Personal Background

S.S.D. was born on December 21, 2004. On the date of his application, he was almost 10 years old and in the fifth grade. (R. 53, 127, 133.) In her November 18, 2014 Disability Report, plaintiff reported that S.S.D. was disabled due to a learning disability and asthma. (R. 131.)

In a Function Report for children age 6 to 12 (Child Function Report) completed on November 18, 2014, plaintiff described S.S.D.'s functional limitations. (R. 118.) She reported that S.S.D.'s ability to communicate was limited only to the extent that he could not tell jokes or riddles accurately. (R. 120.) He was able to read capital and small letters, read and understand simple sentences, print his name, and spell most 3-4 letter words. (R. 120-21.) However, plaintiff stated, he could not read and understand stories in books or magazines, write in script, write a simple story with 6-7 sentences, add and subtract numbers over 10, count money, or tell time. (R. 121.) She stated that S.S.D. had "limited" ability to walk, run, throw a ball, ride a bicycle, jump rope, use roller skates, swim, use scissors, or use video game controls. (R. 122.) However, she also wrote that S.S.D. could play on sports teams. (R. 123.) She noted that S.S.D. was able to make friends, and got along with his parent, adults, and school teachers. (R. 123.) His ability to

2

care for himself was unimpaired, except he had difficulty accepting criticism or correction. (R. 124.) While S.S.D. could keep busy on his own, finish what he started, and work on arts and crafts projects, he could not complete his homework. (R. 125.)

In an "adult" Function Report dated December 2, 2014, which appears to have been completed in error, plaintiff reported that S.S.D.'s hobbies were watching TV, playing basketball, riding his bike, reading, and swimming. (R. 159.) She noted that S.S.D. struggled with reading and comprehension, and his academic performance was below his grade level. (R. 159, 161.) However, S.S.D. had no problems paying attention, following instructions, or getting along with people in authority. (R. 161.) In a narrative statement attached to the report, plaintiff stated that since the third grade S.S.D. had received extra time to take tests, and had an individualized educational program (IEP), but still "struggle[d] with academic achievement," became "easily overwhelmed," and "shut down." (R. 166.)

## II. S.S.D.'S MEDICAL HISTORY

### A. Pre-Application School Records

On January 11, 2013, internist Tristan Da Cunha, M.D., completed a statement in connection with plaintiff's request that S.S.D.'s school provide an accommodation for his disabilities under section 504 of the Rehabilitation Act of 1973. (R. 207.) Dr. Da Cunha stated that S.S.D. had a mild learning impairment, which caused stress, poor grades and lack of motivation. (*Id.*) He recommended personalized tutoring and extra assistance. (*Id.*) On October 30, 2013, in connection with the same request, Dr. Da Cunha stated that S.S.D. should be given double time for test taking. (R. 206.) On March 21, 2014, Dr. Da Cunha conducted a physical exam of S.S.D. and completed a New York City Department of Education form documenting the results. He noted that S.S.D. could participate in regular physical education despite his

3

"intermittent" asthma, and should use Ventolin to treat shortness of breath. (R. 202-204.) He noted again that S.S.D had a "learning disability" and needed "extra help or teaching assistance" for this condition. (R. 204.)

On May 20, 2014, school psychologist Sandra Duch performed a Psychoeducational Evaluation Report. The results of the Report were based on an interview and S.S.D.'s performance on cognitive assessment and academic achievement tests. (R. 226.) In the portion of the report entitled "Student Interview and Assessment Session Behavior Observations," Duch observed that S.S.D. was likable, friendly, cooperative, respectful and polite. (R. 226.) However, with respect to his examination performance, he gave up easily on subtests he viewed to be too difficult, was not willing to answer questions about which he was uncertain, and would not risk guessing. (*Id.*) He required a great deal of refocusing throughout the testing session. (*Id.*)

The academic achievement test revealed that S.S.D.'s academic skills were in the average range. (R. 228.) His broad mathematics and brief mathematics skills were low compared to those in his age group, but his broad reading, basic reading, brief reading, and math calculation scores were average. (R. 228.) His general cognitive ability was in the low average range, and his verbal comprehension and general processing speed were borderline, but his general perceptual reasoning and working memory were average. (*Id.*) On the Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV), S.S.D. had a full scale IQ of 83, which was in the low average range. (*Id.*)

An IEP was prepared on May 28, 2014, when S.S.D. was in the fourth grade, based in part on Duch's report. (R. 230.) The IEP noted that S.S.D. was performing below grade level, and had difficulty with decoding, comprehension, and organizing his writing into complete paragraphs, but he was "approaching grade level" in both reading and math. (R. 230.) The IEP

4

indicated that S.S.D. would perform better in a smaller group, needed extra time to complete tasks, and should work in a quiet setting. (R. 231.) The IEP recommended that S.S.D. participate in general education classes and take the same state and district-wide assessment tests that are administered to general education students. (R. 237, 240.)

On September 16, 2014, S.S.D. was selected by his school to participate in a "Tier 2 Intervention" to provide "support in the areas [where he] is demonstrating difficulty." (R. 219-20.) Tier 2 students receive "supplemental research-based interventions matched to their needs." (R. 220.) Under the program, S.S.D. would receive "small group instructional support" one day each week. (R. 219.) S.S.D. was not selected to receive "Tier 3" support, which involved "more intensive interventions." (R. 220.)

## B. Northside Center for Child Development (Northside Center)

S.S.D. was referred for mental health services at Northside Center by his school and plaintiff. (R. 261.) On March 20, 2015, Jacqueline Knee, L.M.S.W., conducted a psychosocial assessment of S.S.D. (R. 264-85.) During the intake portion of the assessment, plaintiff stated that S.S.D. struggled academically, even after being placed in a setting with a 12:1 student to teacher ratio, being given additional time on tests, and receiving weekly counseling sessions at school. (R. 261.) She noted that S.S.D. was at a fourth grade level in both reading and math, even though he was in the fifth grade. (*Id.*) She reported that, since the second grade, she noticed that S.S.D had seemed "overwhelmed" in school, was "always a little behind," and had difficulty focusing when things were not "hands-on." (*Id.*) During the intake session, S.S.D. was observed to be pleasant and cooperative, made good eye contact, was well-behaved, and responded in full sentences when addressed. (R. 261, 277.) He engaged in organized quiet play when he was not being directly addressed and was attentive when engaged. (R. 261.)

5

Social Worker Knee noted that, although S.S.D. was performing below average in reading and math, he felt positive about school and exhibited no behavioral problems. (R. 265.)[1] He had a positive relationship with his siblings, parent, and relatives, and he followed rules, maintained friendships, and played with his peers. (R. 266.) He had hobbies and activities that he enjoyed and was involved in community activities. (R. 268.) Knee's mental status examination revealed that S.S.D. was fully oriented, attentive, and had normal concentration, good memory, fair insight, and good judgment. (R. 277.) His speech was normal, his thoughts were rational and age-appropriate, his mood was euthymic and congruent, his perception was normal, and his behavior was unremarkable and compliant. (R. 278-79.) Social Worker Knee summarized S.S.D.'s mental issues as feeling anxious/fearful, lacking self-confidence, having learning problems, and difficulty paying attention. (R. 280.) She diagnosed S.S.D. with anxiety disorder and assigned a GAF score of 55. (R. 281, 284.)[2] She recommended psychiatric evaluation, therapy, and an educational evaluation. (R. 283.)

On May 11, 2015, S.S.D. was evaluated by psychiatrist Vanessa Bobb, M.D., Ph.D. (R. 287-89, 298.) Dr. Bobb assigned a GAF score of 50 (indicating serious symptoms) (R. 287).[3] She

---

[1] She also noted that S.S.D. reported that he liked to "play basketball and football," and stated "I like to run and I'm good." (R. 265.)

[2] A GAF score of 60-51 indicates "moderate symptoms" (*e.g.*, flat and circumstantial speech, occasional panic attacks) or moderate difficulty in social occupational, or social functioning (*e.g.*, few friends, conflicts with co-workers). *See* New York State Office of Mental Health, Global Assessment of Functioning, *available at* https://apps.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited August 6, 2018).

[3] A GAF score of 50-41 indicates "serious symptoms" (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *See* New York State Office of Mental Health, Global Assessment of Functioning, *available at* https://apps.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited August 63, 2018).

diagnosed learning disorder, expressive language disorder, and generalized anxiety disorder. (R. 287, 307.) In a Child Psychiatric Evaluation/Assessment, Dr. Bobb observed that S.S.D. was nervous about school, homework, and making new friends, and was a "jumpy kid." (R. 298.) He experienced worry, anxiety, stomach aches, headaches, occasional insomnia, concentration problems, and restlessness. (R. 299.) Dr. Bobb observed that S.S.D. "bounce[d] his knee regularly." (*Id.*) She also noted that, although S.S.D. exhibited an anxious affect, he was cooperative, had good articulation, normal intellectual function (albeit with a possible learning disability), normal thought content, process and impulse control, and was distractible (but only to the extent he did not know the work). (R. 301-302.) S.S.D.'s insight and judgment were within normal limits and his memory and general fund of information were good. (R. 302-303.) Dr. Bobb recommended that S.S.D. start therapy, continue with his IEP, and obtain a school evaluation, but did not prescribe any medication. (R. 305.)

S.S.D. began treatment at Northside on September 18, 2015. (R. 44, 211, 308.) On November 9, 2015, Dr. Bobb noted that S.S.D. was less anxious than before "due to therapy," and was "adjusting to middle school," "learning techniques to calm down," and making friends. (R. 212.) His mental health conditions were "ongoing" but "slowly improving." (R. 214.) A physical examination performed by Dr. Bobb was normal. (R. 213.) She recommended that S.S.D. continue therapy and again did not prescribe any medication. (R. 215.)

## C.    Post-Application School Records

An updated IEP was prepared for S.S.D. on March 20, 2015, when he was in the fifth grade. (R. 247.) The IEP noted that S.S.D. had shown some improvement since the beginning of the school year, and his math skills had improved, but he continued to have difficulty with decoding and comprehension, and his math and reading skills were both at the fourth grade level.

7

(R. 256.) However, S.S.D did not require placement in a specialized classroom, could continue in the general education classroom (R. 251), and was again able to participate in the same state and district-wide student achievement tests administered to general education students. (R. 256.)

On May 13, 2015, special education liaison T. Richards completed an SSA form related to S.S.D.'s school records. (R. 245-46.) Richards noted that S.S.D. ranked in the lowest quartile on a state standardized assessment test given in June 2014, and that he received counseling once a week for 45 minutes to 1 hour. (*Id.*)

At the hearing on December 8, 2015, plaintiff submitted S.S.D.'s test scores on the 2015 state standardized assessment for language arts and mathematics. (R. 208-209.) The test results showed that S.S.D. again ranked in the bottom quartile of fifth grade students in New York City and New York State in both language arts and mathematics. (R. 208-09.)

### D. Opinion Evidence

#### 1. Consultative Examiner Dr. Bard

On January 9, 2015, pediatrician Gregory Bard, M.D., conducted a consultative physical examination of S.S.D. (R. 222.) He noted that S.S.D. had asthma since the age of three, which affected his ability to play and exercise, and that he used an albuterol inhaler. (*Id.*) On examination, S.S.D. appeared to be in no respiratory distress, and his lungs were clear. (R. 223-24.) Dr. Bard diagnosed asthma and a learning disability, and noted that these conditions would affect S.S.D's ability to learn and engage in physical activity. (R. 225.) He opined that S.S.D. should avoid exposure to nicotine, smoking, and environmental allergens and should continue special education, but noted no other limitations. (*Id.*)

## 2.    State Agency Reviewers

On January 16, 2015, state agency review psychiatrist K. Prowda, M.D., and state agency review pediatrician S. Gandhi, M.D., performed a joint assessment of S.S.D.'s functioning based on a review of his school and medical records. They opined that S.S.D's asthma was non-severe, and that his learning disability was severe but did not meet, medically equal, or functionally equal the Listings. (R. 57-59.)

With respect to S.S.D.'s functional limitations, Dr. Prowda opined that S.S.D. had marked limitations with respect to attending and completing tasks, noting that he became distracted easily, gave up easily, and worked best in small groups with minimal distractions. (R. 58.) Dr. Prowda assessed a "less than marked" limitation in S.S.D's ability to acquire and use information because, although he had a learning disability, he took general education classes. (R. 58.) Dr. Prowda also assessed a "less than marked" limitation with respect to S.S.D.'s ability to interact and relate with others. She noted that although school assessments showed elements of immaturity, and S.S.D. easily became anxious and overwhelmed, he had intact speech, and his expressive and receptive language appeared adequate. (R. 57-58.)

Dr. Gandhi completed the physical portion of the functional equivalence assessment. He opined that S.S.D. had a "less than marked limitation" in the domain of "moving about and manipulation of objects," noting that S.S.D. enjoyed "riding his bike, playing basketball and [] soccer." (R. 58.) Dr. Gandhi assessed no limitation with respect to S.S.D.'s health and well being because there was no history of hospitalization or recent emergency room visits related to his asthma, S.S.D. had normal growth parameters, and his asthma appeared well controlled with medication. (R. 59.)

9

### III. HEARING

On December 8, 2015, plaintiff and S.S.D. appeared before ALJ Hecht. (R. 38-50.) Although the ALJ advised plaintiff of her right to a representative, plaintiff chose to proceed without counsel. (R. 38-39.)

Plaintiff testified that S.S.D. was in the sixth grade. She stated that he received "special tutoring" in four subjects, but had never been held back a grade. (R. 41.) She testified that S.S.D. did not have any behavioral issues and got along with his classmates and siblings. (R. 42, 46.) However, he "still struggle[d]" at school and tended to "shut[] down completely" due to his anxiety. (R. 43.) Plaintiff told the ALJ that S.S.D. had started weekly treatment for anxiety at Northside Center in September 2015, but had not been prescribed any medication. (R. 44.) She confirmed that her son had not missed school for any extended period of time during the last 12 months. (R. 46.) She testified that S.S.D. enjoyed coloring and putting puzzles together, but that if the activity takes longer than thirty minutes, "he gives up on it." (*Id.*)

With respect to S.S.D.'s asthma, plaintiff stated that he was treated with medication and that the condition was "controlled at home, most of the time," with the assistance of a nebulizer and albuterol inhaler. (R. 42.) She testified that S.S.D. had not required emergency room treatment for asthma in the last 12 months, and had no physical difficulty running, walking, or playing. (R. 42, 47-48.)

The ALJ then examined S.S.D., who testified that "he likes school" and "has friends in school," and that "math is his most difficult subject," for which he receives "a little bit" of help. (R. 48-49.) S.S.D. explained that there were approximately 16 children in his classroom and that he sometimes received assistance from "two teachers." (R. 49.) He testified that he had no other difficulty in school and that his asthma did not bother him. (*Id.*)

10

## IV.    THE ALJ'S DECISION

### A.    Standards

An individual under the age of 18 is disabled under 42 U.S.C. § 1382c(a) if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations exclude from coverage any "individual under the age of 18 who engages in substantial gainful activity." 42 U.S.C. § 1382c(a)(3)(C)(ii).

The ALJ must follow a prescribed three-step process to determine whether a child is disabled. At step one, the ALJ considers whether the child is engaging in substantial gainful activity. 20 C.F.R. § 416.972(a). If so, the child is not disabled. *Id.* If not, the ALJ proceeds to step two and considers whether the child has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 416.924(a). If the child does not have a severe medically determinable impairment or combination of impairments, he is not disabled. *Id.*

If the child does have a severe impairment or combination of impairments, the ALJ proceeds to step three and determines whether the child's impairment or combination of impairments meets or medically or functionally equals the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listings). In making this determination, the ALJ must consider the combined effect of all medically determinable impairments, even those that are not severe. 20 C.F.R. §§ 416.923, 416.924a(b)(4), 416.926a(a), (c). If the child's impairments meet or medically or functionally equal the severity of one of the listed impairments, and that has lasted or is expected to last for a continuous period of at least 12 months, he is presumed to be disabled. If not, the claimant is not disabled. 20 C.F.R. § 416.924(d).

11

To determine whether an impairment or combination meets or medically equals the Listings, the ALJ must apply the detailed criteria set forth in each potentially relevant Listing. To determine whether an impairment or combination of impairments functionally equals the Listings, the ALJ must assess the child's functioning in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1). In each domain, the ALJ must compare how appropriately, effectively, and independently the child performs activities compared to the performance of other children of the same age who do not have impairments. *See* 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi). In any affected domain, the ALJ must consider the interactive and cumulative effects of the child's impairments. 20 C.F.R. § 416.926a(c). To functionally equal the Listings, the child's impairment or combination of impairments must result in "marked" limitations in two or more domains, or an "extreme" limitation in one or more domain. 20 C.F.R. § 416.926a(d).

A child has a "marked" limitation in a domain when his impairment "interferes seriously" with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). In the domain of health and physical well-being, a limitation is considered "marked" when it results in episodes of frequent illness or exacerbations that results in frequent significant documented symptoms or signs. 20 C.F.R. § 416.926a(e)(2)(iv).

A child has an "extreme" limitation in a domain when his impairment interferes "very seriously" with his ability to independently initiate, sustain, or complete activities. 20 C.F.R § 416.926a(e)(3)(i). In the domain of health and physical well-being, a limitation is considered extreme if it results in episodes of illness or exacerbations that result in significant, documented

symptoms or signs substantially in excess of the requirements for showing a "marked" limitation. 20 C.F.R § 416.926a(e)(3)(iv).

## B. Application

At step one, the ALJ found that S.S.D. "[wa]s a minor and ha[d] never worked." (R. 12.)

At step two, the ALJ found that S.S.D. had the severe impairments of learning disorder and generalized anxiety disorder, but that his asthma was non-severe. (R. 12.) The ALJ noted that S.S.D. testified that his asthma did not bother him, which suggested that it was well controlled with medication; that consultative examiner Dr. Bard found that S.S.D.'s lungs were clear and that S.S.D. was in no respiratory distress; and that S.S.D. had not been hospitalized for asthma-related symptoms within the previous 12 months and did not regularly require emergency nebulizer treatment. (R. 12-13.)

At step three, the ALJ found that S.S.D.'s learning disorder and generalized anxiety disorder did not meet or medically equal the severity of any disability in the Listings. The ALJ considered Listing 112.02 (Learning Disorder)[4] and Listing 112.06 (Generalized Anxiety Disorder),[5] but found that S.S.D. did not meet either Listing because he did not establish that he had two "marked limitations," and therefore did not meet the paragraph B criteria. (R. 14.)

---

[4] At the time of the ALJ's decision, Listing 112.02 required a showing of at least one of the "paragraph A criteria" and at least two of the "paragraph B criteria." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 112.02(A), (B)(2) (2015). Paragraph A required medically documented findings of: (1) developmental arrest, delay or regression; (2) disorientation to time and place; (3) memory impairment; (4) perceptual or thinking disturbance; (5) disturbance in personality; (6) disturbance in mood; (7) Emotional lability (*e.g.* sudden crying); (8) impairment of impulse control; (9) impairment of cognitive function; or (10) disturbance of concentration, attention, or judgment. *Id.* § 112.02(A). Paragraph B required a showing of: (a) marked impairment in age-appropriate cognitive/communicative function; (b) marked impairment in age-appropriate social functioning; (c) marked impairment in age-appropriate personal functioning; or (d) marked difficulties in maintaining concentration, persistence, or pace. *Id.* § 112.02(B)(2).

[5] Listing 112.06 also required a showing of at least one of the paragraph A criteria, and at least two of the paragraph B criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.06(A), (B) (2015). For

The ALJ then analyzed whether S.S.D.'s impairments were functionally equivalent to the Listings. He concluded that S.S.D. had a "marked" limitation in only one domain, concerning "attending and completing tasks," and that he had "less than marked" limitations, or no limitations at all, in the other five domains. (R. 21-30.)

First, the ALJ found that S.S.D. had a less than marked limitation in the domain of acquiring and using information. (R. 19-21.) The ALJ reasoned that although S.S.D. had low test scores and struggled academically with math and reading, he had never been held back a grade in school, was not in danger of being retained a grade, and had made some progress by attending special education classes. (R. 21.) "Further, his improvement demonstrates that he is not refractory to treatment." (*Id.*)

Second, the ALJ found that S.S.D. had a marked limitation with respect to attending and completing tasks. (R. 21-24.) The ALJ noted that S.S.D. required tasks to be broken down, was uncertain and distracted when performing work in groups, had difficulty with tasks that were not hands-on, required close supervision, and gave up on tasks that were too difficult. (R. 23-24.) The ALJ found that S.S.D.'s "anxiety impedes his progress to a greater extent than his learning disorder in this domain," and concluded that while therapy had reduced some of his anxiety,

---

Listing 112.06, paragraph A required medically documented findings of: (1) excessive anxiety manifested when the child is separated, or separation is threatened, from a parent or parent surrogate; (2) excessive and persistent avoidance of strangers; (3) persistent unrealistic or excessive anxiety and worry, accompanied by motor tension, autonomic hyperactivity, or vigilance and scanning; (4) a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; (5) recurrent severe panic attacks, manifested by a sudden unpredictable onset of intense apprehension, fear, or terror, often with a sense of impending doom, occurring on the average of at least once a week; (6) recurrent obsessions or compulsions which are a source of marked distress; or (7) recurrent and intrusive recollections of a traumatic experience, including dreams, which are a source of marked distress. The paragraph B criteria for Listing 112.06 – for children age 3 to 18 – were the same as the paragraph B criteria for Listing 112.02. *Id.* § 112.06(B).

14

S.S.D. "continues to experience the effects of [this] on his functioning to a market extent." (R. 24.)

Third, the ALJ concluded that S.S.D. had a less than marked limitation in interacting and relating to others. (R. 24-26.) The ALJ noted that although S.S.D. exhibited immaturity and became easily overwhelmed, he was able to maintain friendships, interact appropriately with adults, siblings, schoolmates, and teachers, and control his behavior. (*Id.*)

Fourth, the ALJ found that S.S.D. had a less than marked limitation in the domain of moving about and manipulating objects. He based this conclusion on the "totality of the evidence," including Dr. Da Cunha's assessment that S.S.D. could engage in regular physical education classes; a notation in the May 28, 2014 IEP showing that S.S.D. engaged in physical activities; and Dr. Bard's normal physical examination findings. (R. 27.) The ALJ assigned little weight to plaintiff's statements in the Child Function Report that S.S.D. could not engage in physical activities such as walking, running, throwing a ball, riding a bike, roller skating, or swimming because the "medical record" and her own hearing testimony did not support these opinions. (R. 28.) As the ALJ noted, plaintiff stated in a function report that S.S.D could ride a bicycle, swim, and play basketball and soccer. (R. 28, 159.)

Fifth, the ALJ concluded that S.S.D. had no limitation in his ability to care for himself. (R. 29.) The ALJ noted that S.S.D. was clean, neat, and unremarkable in appearance during Social Worker Knee's examination on March 20, 2015; his impulse control was observed to be normal; he had a normal thought process; his judgment was within normal limits; and he did not engage in risky behavior. (*Id.*) The ALJ also noted that plaintiff reported that S.S.D. was generally able to care for himself (or cooperate with others in taking care of personal needs).

15

(*Id.*) The ALJ assigned "little credit" to plaintiff's opinion that S.S.D. was not able to accept criticism or correction, because there was no support for it elsewhere in the record. (*Id.*)

Finally, the ALJ determined that S.S.D. had no limitation in the domain of health and physical well-being. (R. 31.) In particular, the ALJ noted that S.S.D. had not missed a day of school during the school year and that there was no evidence that his asthma required "hospital treatment or intensive therapies interfering with" his school day. (*Id.*)

Having concluded that S.S.D. did not have an impairment or a combination of impairments resulting in marked limitations in two domains of functioning, or an extreme limitation in any one of the six domains, the ALJ concluded that S.S.D was not disabled within the meaning of the Act. (R. 31.)

## V.  ANALYSIS

### A.  Standards of Review

Where, as here, the Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), she must establish that no material facts are in dispute and that she is entitled to judgment as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017). The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Thus, the reviewing court may set aside a decision of the Commissioner only "if it is based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). Where, as here, an applicant challenges the agency's decision, the court must first decide whether the Commissioner applied the correct legal

standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at \*8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at \*8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi v. Astrue*, 2009 WL 50140, at \*21 (S.D.N.Y. Jan. 7, 2009) (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), and *Williams v. Bowen*, 859 F.2d 255, 256 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.*; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) Thus, where the ALJ fails to

17

provide an adequate "roadmap" for his reasoning, remand may be appropriate. Where the ALJ adequately explains his reasoning, however, and where his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.") (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)).

## B. Duty to Develop the Record

Before addressing whether the ALJ's decision was supported by substantial evidence, I must first determine whether the ALJ satisfied his threshold duty to develop the record. After carefully reviewing the record, I conclude that the ALJ satisfied this duty. In the Second Circuit, an "ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (alteration in original) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* at 112-13. In the case of *pro se* litigants, the ALJ's duty to develop the record is "heightened." *Id.* at 113 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). "The ALJ must 'adequately

18

protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered' and by 'scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts.'" *Id.* (alterations in original) (citation omitted).

"The ALJ's responsibility to help a claimant obtain complete medical records dovetails with the treating physician rule, which requires controlling weight be given the opinion of a claimant's treating physician when it is supported by accepted diagnostic techniques and not inconsistent with other evidence in the record." *Oliveras ex rel. Gonzalez v. Astrue*, 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report and recommendation adopted,* 2008 WL 2540816 (S.D.N.Y. June 25, 2008). "The combination of these two principles, compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability." *Id.* (quoting *Pabon v. Barnhart,* 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003)) (alteration in original; internal quotation marks omitted). However, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. App'x 29, 34 (2d Cir. 2013). In *Tankisi,* where the record before the ALJ was "quite extensive" and included an informal "assessment of Tankisi's limitations from a treating physician," as well as opinions from two separate consulting examiners, the court held that remand was not required "solely" on the ground that the ALJ failed to request medical source statements. *Id.* at 34. *See also Rivera v. Comm'r of Soc. Sec.*, 2015 WL 6619367, *11 (S.D.N.Y. Oct. 30, 2015) (quoting *Tankisi*, 521 Fed. App'x at 34) (remand is not required so long as "'the record contains sufficient evidence from which an ALJ can assess [claimant's] residual functional capacity'"). However, the failure to obtain any medical source statements at all – particularly where there are gaps in the underlying treatment

notes and no consultative examinations were performed – constitutes legal error and provides a sufficient basis for remand. *See, e.g.*, *Sanchez v. Colvin*, 2015 WL 736102, at \*9 (S.D.N.Y. Feb. 20, 2015) (where underlying administrative record was "a far cry from that in *Tankisi*," it was "legal error for the ALJ not to obtain opinions from plaintiff's treating physician, and especially her treating psychiatrist, regarding Sanchez's specific conditions and limitations").

Here, the ALJ did not obtain a medical source statement from Dr. Bobb, S.S.D's treating psychiatrist. However, the record contains sufficient evidence from which the ALJ could assess S.S.D.'s functional limitations related to these impairments. Seven months before the hearing, Dr. Bobb provided a narrative report which thoroughly recounted S.S.D.'s psychiatric medical history and evaluated his attitude, speech, affect, mood, intellectual functioning, thought process and content, attention span, psychomotor functioning, and insight, as well as the presence of any perceptive disturbances and any impairment of judgment or memory. (R. 301-303.) She also provided recommendations for treatment. (R. 305.) In addition, the record contains a full-length psychosocial assessment by Social Worker Knee (R. 264-85), who thoroughly evaluated S.S.D.'s mental status, including his attitude toward his family, peers, and the community, as well as his cognition, orientation, speech, thought content and process, mood, affect, perceptions, and behavior.[6] The record also contains an evaluation by Dr. Da Cunha, addressing accommodations for S.S.D.'s anxiety and learning disability, and an educational evaluation performed by school psychologist Duch in May 20, 2014 (four months before the alleged onset of his disability), which provides an in-depth assessment of S.S.D's general cognitive and academic ability. The

_____

[6] Although Knee is not a physician, licensed master social workers are "important" sources to whom an ALJ may appropriately look to evaluate the "severity and functional effects" of an impairment. *Smalls v. Colvin*, 2017 WL 1250832, at \*14 (S.D.N.Y. Mar. 15, 2017), *report and recommendation adopted,* 2017 WL 1274218 (S.D.N.Y. Apr. 4, 2017 (quoting SSR 06–03p, 2006 WL 2329939, at \*1-2 (2006)).

ALJ also relied on the expert opinions of state agency review psychiatrist Dr. Prowda and state agency review pediatrician Dr. Gandhi, who performed a joint assessment of S.S.D.'s functioning based on a review of his school and medical records. (R. 17.) Finally, S.S.D.'s fourth and fifth grade IEPs contained information regarding his performance compared to his peer group, his writing and math ability, and the accommodations provided for his impairments.

With respect to S.S.D.'s physical limitations caused by his asthma, the ALJ appropriately relied on the function reports completed by plaintiff, the medical source statement from consultative examiner Dr. Bard (whose opinions the ALJ assigned "great weight") (R. 17), and the physical examinations of Dr. Bobb and Dr. Da Cunha. Accordingly, the Court finds that the ALJ had an adequate record concerning S.S.D.'s impairments and functional limitations.

### C.     The ALJ's Determination Is Supported by Substantial Evidence

#### 1.     Whether S.S.D.'s Impairments Met or Medically Equaled Listing 112.02 or Listing 112.06

The ALJ determined that S.S.D. did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing because S.S.D. did not establish that he had two "marked limitations," as required to satisfy the paragraph B criteria for the relevant Listings. (R. 14.) The ALJ did not further explain his reasoning. However, "[t]he brevity of the ALJ's analysis [at this step] does not, in and of itself, necessitate remand . . . as long as the Court can clearly discern that there is substantial evidence in the record to support his conclusion." *Hairston ex rel. S.N. v. Comm'r of Soc. Sec.*, 52 F. Supp. 3d 657, 672 (S.D.N.Y. 2014); *see also Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) ("the absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence").

21

As the ALJ correctly observed, S.S.D.'s impairments potentially implicated Listing 112.02 (Organic Mental Disorders), characterized by "abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain," 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.02 (2015); and Listing 112.06 (Anxiety Disorders), where anxiety is "either the predominant disturbance or is experienced if the individual attempts to master symptoms." *Id.* § 112.06. These Listings are met when a child satisfies one of each Listing's unique "paragraph A criteria,"[7] and two "paragraph B criteria," which are the same for both Listings. As noted above, the paragraph B criteria required a claimant to show: (a) marked impairment in age-appropriate cognitive/communicative function; (b) marked impairment in age-appropriate social functioning; (c) marked impairment in age-appropriate personal functioning; or (d) marked difficulties in maintaining concentration, persistence, or pace. *Id.* §§ 112.02(B)(2), 112.06(B).[8]

The ALJ found a "marked" limitation in only one of the paragraph B criteria. (R. 14.) Although he neglected to analyze each of the paragraph B criteria separately for this purpose, I conclude that there is substantial evidence in the record to show that the claimant was *not* markedly impaired with respect to criteria (a), (b), or (c), and therefore that the "brevity of the ALJ's analysis," *Hairston*, 52 F. Supp. 3d at 672, does not require remand. *See, e.g.*, *Salmini v. Comm'r of Soc. Sec.*, 371 Fed. App'x 109, 112-13 (2d Cir. 2010) (declining to remand where "other portions of the ALJ's detailed decision, along with plaintiff's own testimony, demonstrate that substantial evidence supports . . . the ALJ's determination").

---

[7] *See* notes 4 and 5, *supra*.

[8] Here and below, I apply the regulations as they existed at the time of the ALJ's decision. The term "marked" is given the same definition as is used in 20 C.F.R. § 416.926a(e) to determine functional equivalence. *See* 20 C.F.R. § 416.925(b)(ii) (2011).

With regard to "cognitive/communicative functioning," the regulations provide that "a primary criterion for limited cognitive function is a valid verbal, performance, or full scale IQ of 70 or less." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(C)(2)(a). S.S.D. could not meet this criterion. His performance on the WISC-IV revealed an IQ of 83, and his general cognitive ability fell in the low average range. (R. 228.). He had never been held back a grade, and he was placed in general education classes. (R. 240, 256.) Similarly as to S.S.D.'s communicative functioning, the ALJ noted, in his domain analysis, that he had a normal speech rate, volume and articulation. (*See, e.g.*, R. 20-21, 213-14, 223, 278, 301-302.)

There is also ample evidence to support the conclusion that S.S.D. did not have a marked limitation in "social functioning," which refers to a "child's capacity to form and maintain relationships with parents, other adults, and peers," and "includes the ability to get along with others." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(C)(2)(b). As the ALJ noted in his domain analysis (and as plaintiff herself testified), S.S.D. interacted appropriately with his siblings, classmates, parents, and teachers. (R. 42, 46, 123, 266.) He also related to physicians in a "cooperative" and "age-appropriate" manner. (R. 25-26, 223, 301.)

Finally, there is no evidence in the record that would suggest that S.S.D. had any limitations with respect to "personal functioning," which is measured by "the child's increasing ability to help himself/herself and to cooperate with others in taking care of these needs." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(C)(2)(c). To the contrary: plaintiff herself stated that S.S.D. had virtually no limitations in his ability to care for his personal needs. (R. 124, 157.)

Accordingly, the ALJ's determination that S.S.D.'s impairments did not meet or medically equal any Listing is supported by substantial evidence in the record.

## 2. Whether S.S.D.'s Impairments Were Functionally Equivalent to the Listings

Having failed to meet or medically equal the requirements of any Listing, S.S.D. could only be considered disabled if he had an "extreme" limitation in one of the six domains of function set forth in 20 C.F.R. § 416.926a or "marked" limitations in two or more domains. In his functional equivalence analysis, the ALJ determined that S.S.D. had only one marked limitation: in the domain of attending and completing tasks. I conclude that the ALJ's determination that S.S.D. had no "marked" limitation in any other domain was supported by substantial evidence.

### a. *Acquiring and Using Information*

The first domain, "acquiring and using information," considers how well a child is able to acquire or learn information, and how well a child uses the information he has learned. 20 C.F.R. § 416.926a(g) (2015). Examples of limitations include when a child has difficulty remembering important things that were learned in school the day before, difficulty rhyming words or sounds, difficulty solving math questions or computing arithmetic answers, and talks in short, simple sentences and has difficulty explaining himself. 20 C.F.R. § 416.926a(g)(3) (2015).

There is substantial evidence in the record to support the ALJ's conclusion that S.S.D. had a less than marked limitation in this domain. Although S.S.D. performed below average on state assessment tests, had difficulty with comprehension and organization, and received special education assistance (R. 19-20), he also worked well in small groups; benefitted from visual aids; had intact memory, normal speech, and rational thought pattern; possessed a good "general fund of information" for his age; had never been retained a grade; and had made progress in his academic performance through therapy and special education classes. (R. 21.)

24

Moreover, the ALJ did not err in assigning "little credit" to plaintiff's opinion, expressed in the initial Child Function Report, that her son could not read and understand stories in books or magazines, write in longhand, write a simple story with 6 to 7 sentences, add and subtract numbers over 10, understand money, make correct change, or tell time. (*See* R. 21.) The regulations in effect at the time of the ALJ's decision required him to evaluate opinion evidence from nonmedical sources, including parents and caregivers. 20 C.F.R. § 416.913(d)(4) (2013). However, where the source did not have a "professional" relationship with the child – for example, a parent – the ALJ was not required to explain the weight given to his or her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *6.

Here, the ALJ did explain why he discounted plaintiff's opinion as to S.S.D's ability to acquire information, noting that she had no background in psychology or psychiatry (R. 18) and that her opinion was not entirely consistent with his medical and academic records, which showed that S.S.D.'s performance on math and reading assessments, although low, was not limited to the extent described by plaintiff. (R. 21.) The Court also notes that the Child Function Report was more than one year old by the time of the hearing, during which period S.S.D. had made academic progress and been promoted into the sixth grade. Thus, the Court cannot conclude the ALJ erred in declining to fully credit plaintiff's opinion. *See Rogers v. Colvin*, 2016 WL 4626572, at *14 (S.D.N.Y. Sept. 6, 2016) (finding no error where "the ALJ satisfied his responsibility of considering [the non-medical source] and made a reasoned decision to accord little weight to [that opinion]").

### b. *Interacting and Relating with Others*

The third domain, "interacting and relating with others," considers how well a child is able to initiate and sustain emotional connections with others, develop and use language,

cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. 20 C.F.R. § 416.926a(i) (2015). A normally functioning school-age child should be able to develop lasting friendships with his peers, begin to understand how to work in groups, understand and talk to people of all ages, share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand. 20 C.F.R. § 416.926a(i)(2)(iv) (2015). Evidence of limited functioning in this domain includes an absence of close friends, avoidance of people the child knows, anxiety about new people or experiences, difficulty playing games or sports with rules, or difficulty communicating with others or speaking intelligibly or fluently. 20 C.F.R. § 416.926a(3)(ii)-(vi) (2015).

The ALJ properly concluded that S.S.D. had a "less than marked" limitation in this domain because he maintained friendships, controlled his behavior, interacted appropriately with his siblings, peers and teachers at school, made good eye contact with examiners, and was involved in community activities. (R. 25, 212, 223, 226, 231, 266, 277.) Plaintiff herself noted that, although S.S.D. needed time before he felt comfortable with others, he was becoming "more verbal and social." (R. 281.)

### c. *Moving About and Manipulating Objects*

The fourth domain, the ability to "move about and manipulate objects," considers how well a child is able to move his body from one place to another and move and manipulate objects. 20 C.F.R. § 416.926a(j) (2015). The regulations note that a school-age child without an impairment should have gross motor skills that permit him to move efficiently at school, home, and in his neighborhood. 20 C.F.R. § 416.926a(j)(2)(iv) (2015). He should have the fine motor skills to use kitchen and household tools independently, use scissors, and write. *Id.* Examples of limitations in this domain include difficulty with motor activities (*e.g.*, unintentionally dropping

26

things) because of muscle weakness, joint stiffness, or sensory loss; difficulty with balance or climbing up and down stairs; difficulty coordinating gross motor movement (*e.g.*, bending, kneeling, crawling, running, jumping rope, or riding a bike); difficulty sequencing hand or finger movements; difficulty with fine motor movements; or poor eye-hand coordination when using a pencil or scissors. 20 C.F.R. § 416.926a(j)(3) (2015).

Substantial evidence supported the ALJ's determination that S.S.D.'s limitations in this domain were "less than marked." (R. 27.) As the ALJ observed, plaintiff had no developmental delays and attended regular physical education classes. (*Id.*) State agency examiner Dr. Bard assessed that S.S.D. needed no help getting on and off the examination table, his gait was normal, and he had normal range of motion, full strength, and age appropriate fine motor activity and hand strength. (R. 223-24.) Dr. Bobb observed that S.S.D. had full muscle tone and strength, normal gait and station. (R. 28, 213.)

The ALJ assigned "little credit" to plaintiff's statement in the Child Function Report that S.S.D. could not walk, run, throw a ball, ride a bike, or engage in various other physical activities. (R. 28, 122.) Again, this was not error. As the ALJ noted, plaintiff's statement was inconsistent with her own report that S.S.D. could ride a bicycle, swim, play basketball, and play soccer, and her testimony that he had no difficulty walking, running, or playing. (R. 47-48, 159.) It was also inconsistent with S.S.D.'s testimony that his asthma did not "bother" him. (R. 49.) Nor was there any other evidence of any physical deficits. (*Id.*) Because the ALJ fairly considered plaintiff's opinion and provided good reasons for the weight he assigned to it, the Court can find no error in the ALJ's determination.

#### d.    Caring for Yourself

The fifth domain, "caring for yourself," considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways, copes with stress and change in the environment, and cares for his own health, possessions, and living area. 20 C.F.R. § 416.926a(k) (2015). Examples of difficulties in this domain include using self-soothing activities that are developmentally regressive (*e.g.*, thumb sucking or re-chewing food), failing to dress or bathe age-appropriately, engaging in self injurious behavior or self-harm, or a disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3) (2015).

Substantial evidence supports the ALJ's conclusion that S.S.D. had "no limitation" in this domain. (R. 29.) Although plaintiff reported that S.S.D. was not able to "accept criticism or correction" (R. 124), she herself noted that her son was virtually unlimited in his self-care functions, including feeding, bathing, and grooming himself, doing chores, obeying rules, and getting to school on time. (R. 124.) No assessment revealed any behavioral problems or problems with impulse control. (R. 29.) Rather, S.S.D.'s thought process and judgment were unimpaired, and he did not engage in risky or self-injurious behavior. (*See, e.g.*, R. 277-78, 282, 302.)

#### e.    Health and Physical Well-Being

Finally, the ALJ properly concluded that S.S.D. had "no limitation" in the domain of health and physical well-being. (R. 30.) This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's health and functioning that were not considered in the evaluation of the domain of "moving about and manipulating objects." 20 C.F.R. § 416.926a(l) (2015). Examples of limitations include

28

symptoms of weakness, dizziness, agitation, lethargy, or psychomotor retardation; somatic complaints related to an impairment such as seizures, headaches or incontinence; or limitations in physical functioning because of the need for frequent treatment of a condition. 20 C.F.R. § 416.926a(l)(4) (2015). As the ALJ properly noted, S.S.D.'s asthma was under good control with medication. (R. 31, 42.) S.S.D. did not require hospital treatment or "intensive therapies" interfering with his school day. (R. 31, 42.) Moreover, there is no evidence that S.S.D.'s learning disability or anxiety impaired his health and well-being other than as considered above. For example, plaintiff testified that S.S.D. had not missed school for any extended period of time in the last year due to his impairments. (R. 46.)

## VI.  CONCLUSION

Since the ALJ applied the correct legal standards, and since there is substantial evidence in the record to support the ALJ's determination that S.S.D.'s impairments did not meet, medically equal, or functionally equal the severity of any listed impairment, I respectfully recommend that the Commissioner's motion be GRANTED and the case be DISMISSED. The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff.

Dated: New York, New York
       August 6, 2018

**BARBARA MOSES**
**United States Magistrate Judge**

29

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Katherine P. Failla at 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Failla. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).